IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Magistrate Judge Maritza Dominguez Braswell**

Civil Action No. 1:20-cv-02705-MDB

JOHN HEIKKILA

 Plaintiff,

v.

KAHR FIREARMS GROUP

 Defendant.

---

## ORDER

---

 This matter is before the Court on two motions. Defendant Kahr Firearms Group filed a Motion to Preclude Plaintiff's Proposed Expert Paul Paradis. (["Daubert Motion"], Doc. No. 56.) Plaintiff filed a response in opposition, and Defendant replied. (["Daubert Response"], Doc. No. 67; ["Daubert Reply"], Doc. No. 69.) Defendant also filed a Motion for Summary Judgment. (["SJ Motion"], Doc. No. 61.) Plaintiff filed a response in opposition, and Defendant replied. (["SJ Response"], Doc. No. 66; ["SJ Reply"], Doc. No. 70.)

 For the reasons described herein, the Daubert Motion is **DENIED**, and the SJ Motion is **GRANTED IN PART AND DENIED IN PART.**

# I. BACKGROUND

***The Incident***

This is a products liability action arising from an incident that occurred at a Cinemark

Movie Theater in Colorado Springs, Colorado, on August 12, 2018. (*See* Doc. No. 61 at 3; Doc.

No. 66 at 2.) The following facts are detailed in Defendant's Statement of Material Facts, and

admitted by Plaintiff in his Response to Defendant's Statement of Material Facts:

- On August 12, 2018, before visiting the Cinemark Movie Theater ("Movie Theater") located in Colorado Springs, Colorado, Plaintiff, his wife, and daughter stopped at Big R, a retail store, to purchase a Blackhawk Holster.

- After leaving Big R, Plaintiff, his wife, and daughter went to have lunch.

- After eating lunch, Plaintiff and his family proceeded to the Movie Theater.

- Plaintiff was prohibited from carrying a firearm in the Movie Theater as it is against Cinemark's policy.

- After gaining access to the Movie Theater, Plaintiff went to the bathroom, entered the stall, pulled down his pants with the holstered pistol still attached to his belt, and used the bathroom.

- While proceeding to get up from the toilet, Plaintiff pulled up his pants to below his waist, while trying to hold his pants in place by spreading his legs. (Ex. A, at 81-82.)

- As he started tucking in his shirt, the right side of his jeans "tipped down," and he heard a gunshot.

- After realizing what happened, Plaintiff buttoned his pants, picked up the Subject Pistol, removed the spent casing, put the Subject Pistol in his pants pocket, and proceeded out of the bathroom.

- Without notifying staff of the incident, Plaintiff proceeded to the concession stand of the Movie Theater and told his wife and daughter that they had to leave.

- Plaintiff's wife then transported him to the hospital for treatment.

(*See* Doc. No. 61 at 3-4; Doc. No. 66 at 2-3 (internal cites to the record omitted).) In his

Statement of Additional Disputed Facts, Plaintiff adds that on the day in question the gun "fell

out of its holster and discharged when the upper right corner of the rear slide struck the tile floor,

striking him in the abdomen." (Doc. No. 66 at 4 (citing Doc. No. 61-4 [Heikkila Depo.], at 82:

15-16).) As evidence of this, Plaintiff states that "[t]here are chips in the tile flooring where the

gun struck upon impact that are consistent with the dimensions of the rear slide." (*Id.* (internal

cites to the record omitted).) Defendant denies "Plaintiff's account of the manner in which the

Subject Pistol discharged," citing to its expert report for support, and arguing "that the chips in

the tile flooring likely occurred when the tile was being installed." (Doc. No. 70 at 2.)

Additionally, Defendant argues that the alleged facts concerning the discharging of the gun when

it fell to the floor, are immaterial. (*Id.* At 1-2.)

Plaintiff brought negligence and products liability claims, alleging that Defendant

breached its duties to manufacture and sell the pistol "in a safe and reasonable manner that would

not allow for accidental discharges when the weapon was dropped." (Doc. No. 3 at ¶ 18.)

### The Experts

Plaintiff hired Paul Paradis, a retired Criminalist for the Colorado State Public Defenders

and owner of Paradise Sales, a Colorado firearms store, to render an expert opinion in this case.

(["Paradis Report"], Doc. 56-3.) Mr. Paradis's opinion is that "the discharge was more likely

than not caused by a significant impact of the firearm against a hard surface due to being

dropped." (*Id*. at 7.) In his report, Mr. Paradis notes that he investigated the scene, investigated

Plaintiff's clothing, and inspected the firearm. (*Id*. at 3-4.) He also explains how he tested the

firearm, and notes that he was "precluded from doing a drop test of this firearm by Kahr's

attorneys and [is] unaware of what types of drop-testing, if any, [have] been conducted by Kahr on any of their firearms." (*Id*. at 4.)

Defendant retained Michael Shain, who inspected the incident-related evidence at Mr. Paradis's shop and conducted drop testing of new-in-box exemplar firearms. (Doc. No. 61-5 at 3-7.) Mr. Shain also reviewed Plaintiff's deposition, the police report, the report and photos of Mr. Paradis, and other materials. Mr. Shain formed the following opinions:

- Plaintiff used Blackhawk holster for his firearm and that holster was not designed for this application.

- Plaintiff also "incorrectly employed the holster as an 'open carry,' outside the pants holster, when it was specifically intended to be worn as an 'Inside-The-Pants' concealment holster."

- In doing so, Plaintiff "created an unsecure and unsafe condition."

- Plaintiff also "recklessly failed to secure his fully loaded pistol and allowed the still holstered pistol to be completely unsecured and uncontrolled while in the Cinemark Theater Men's Room stall."

- The "extensive drop testing revealed no discharges of Exemplar Kahr pistols."

- "Based on this extensive testing…the Kahr PM45 pistol is not susceptible to a drop discharge under the conditions set forth in this case."

- "There is no physical evidence or testing data in the record to support the allegation that an impact discharge of the Kahr PM45 pistol caused Mr. Heikkila's injury. In fact, the physical evidence and the testing data support a discharge that was not the result of a drop impact."

- "By eliminating a drop fire discharge from consideration through testing, Mr. Heikkila's injury was most likely a self-inflicted wound as the result of an accidental or inadvertent trigger pull."

- "…the Kahr PM45 is of a safe design, passes the relevant industry and state imposed 'drop safety' standards, and it can be handled safely and used safely for its intended use."

(Doc. No. 61-5 at 21-22.)

Defendant also retained Derek Watkins, who inspected the firearm, plaintiff's clothing, and the scene of the incident. (*See generally* Doc. No. 61-4). Mr. Watkins also conducted what he refers to as abuse tests. (*Id.*) Additionally, Mr. Watkins also employed "[a] computer simulation incident reconstruction…to investigate the feasibility of [Plaintiff's] testimony." (*Id.* at 3.) Mr. Watkins issued the following opinions:

- "No design or manufacturing defects were found in the subject pistol[.]"

- "No defects were found in the design or manufacture of the subject pistol which were in any way related to Mr. Heikkila's shooting incident[.]"

- "The subject pistol is safe in design and manufacture for its intended and reasonably foreseeable uses[.]"

- "The incident reconstruction modeling indicates that the discharge of Mr. Heikkila's pistol and his resulting injury were caused by his negligent and careless handling of the pistol in the bathroom stall and his failure to follow safe gun handling practices[.]"

- "The firearm's design, extensive drop testing, and the physical evidence of this case all indicate that this incident was caused by an accidental or intentional trigger pull, and was not the result of the firearm striking the tile floor of the bathroom[.]"

(*Id.* at 21.)

In his rebuttal report, Mr. Paradis notes that Defendant's experts point to the American National Standards Institute (ANSI) and Sporting Arms & Ammunition Institute (SAAMI) for standards that manufacturers must meet to ensure public safety. (Doc. No. 56-4 at 2-3.) However, according to Mr. Paradis, the experts' failure to "acknowledge the failure of the ANSI and SAAMI standards," is notable because despite complying with those standards, certain firearms have failed/fired when dropped. (*Id.*) Mr. Paradis also appears to call the Defense experts' drop testing into question, noting that the firearms they tested "were not the Kahr PM45

in question," and reflecting concern that testing of the subject firearm was precluded by Kahr. (*Id.* at 4.)

Mr. Paradis addresses the Defense experts' conclusions that Plaintiff mishandled the weapon, by stating, "[i]gnorance is unfortunately common in the firearm world; I am not surprised by Mr. Heikkila's use of his firearm in this case. Further I can understand use of the holster as the belt tension is just about as great in the pants as well as outside the pants." (*Id.* at 5.) Mr. Paradis does not elaborate further on this, other than to say, "the industry as a whole needs more improvement with regard to consumer education." (*Id.*)

Mr. Paradis also addresses the evidence and Defense experts' version of what most likely happened on the day in question. Specifically, Mr. Paradis addresses the blood-stained clothes Plaintiff was wearing that day, the medical records, the stall where the incident occurred, the cracked tile on the floor, and the accident reconstruction video prepared by Mr. Watkins and his team. (*Id.* at 5-22.) The Court will not recite all of Mr. Paradis's rebuttal points, but notes that Mr. Paradis criticizes Mr. Watkins's reconstruction animation as "not reliable or probable," because it "leaves out critical information such as Mr. Heikkila's pants and that he was wearing cowboy boots at the time of the discharge." (*Id.* at 16-17.) Mr. Paradis also notes that certain measurements in the reconstruction are not supported by physical and medical evidence, and that the "absence of gun residue on the clothing," as well as the absence of any "stippling on his skin near the entry wound," support Plaintiff's assertion that the gun did not discharge in close proximity to Plaintiff's body." (*Id.* 18-34.) In concluding his rebuttal report, Mr. Paradis' states that the bullet's path "is consistent with an impact from the floor," the "lack of muzzle effluent on the clothing or stippling on the skin show that his firearm discharged outside of arms reach[,]"

the "damage to the floor tiles [is] consistent with the gun having been dropped," and "historical information show[s] that a drop fire incident has happened in the past with Kahr and other firearm manufacturers despite adherence to ANSI and SAMMI standards." (*Id*. at 35.) In short, Mr. Paradis does not identify a particular defect, but he explains why a defect causing discharge on impact, is more probable than an intentional or accidental trigger pull by Plaintiff.

## II. LEGAL STANDARD

### A.  Legal Standard on Defendant's Daubert Motion

The standard for admitting expert testimony is set forth in Rule 702 of the Federal Rules of Evidence ("FRE") as interpreted by the United States Supreme Court in, *Daubert v. Merrell Dow Pharmaceutical, Inc*., 509 U.S. 579, 113 S. Ct. 2786 (1993). FRE 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Under *Daubert*, district courts "must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. In this sense, a court acts as a "gatekeeper" in admitting or excluding expert testimony. *Bitler v. A.O. Smith Corp.,* 400 F.3d 1227, 1232 (10th Cir. 2005); *Pinon Sun Condo. Ass'n, Inc. v. Atain Specialty Ins. Co.,* 2020 WL 1452166, at *3 (D. Colo. Mar. 25, 2020). Fulfilling this gatekeeping function requires a two-part analysis. First, the Court must consider whether the expert testimony is relevant. Expert testimony is relevant if it would "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Second, the Court must consider whether the expert

7

opinions are reliable. They are reliable if: (1) the expert is qualified "by knowledge, skill, experience, training, or education," (2) the opinions are "based upon sufficient facts or data," and (3) they are "the product of reliable principles and methods." *Id*. The burden to show the expert's testimony is relevant and reliable (and therefore admissible), is on the proponent of the testimony. *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009).

**B.     Legal Standard on Defendant's Summary Judgment Motion**

The Court may grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works, Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994) (citing *Celotex*, 477 U.S. at 325). The nonmoving party may not rest solely on the allegations in the pleadings, but instead, must designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324; *see also* Fed. R. Civ. P. 56(c).

"A 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986)). Whether there is a genuine dispute as to a material fact depends upon "whether the evidence presents a sufficient disagreement to require submission to a jury," or conversely, whether the evidence "is so one-sided that one party must prevail as a matter of law." *Carey v. U.S. Postal Serv.*, 812 F.2d 621, 623 (quoting *Anderson*, 477 U.S. at 251-52). A disputed fact is

"material" if "under the substantive law it is essential to the proper disposition of the claim."

*Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson*, 477 U.S. at

248). A dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return

a verdict for the nonmoving party. *Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th

Cir. 2011) (citing *Anderson*, 477 U.S. at 248). "Where the record taken as a whole could not lead

a rational trier of fact to find for the [nonmovant], there is no 'genuine issue for trial.'"

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *First Nat'l

Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

## III. ANALYSIS

### A.   Defendant's *Daubert* Motion

Defendant argues that Plaintiff has proffered Mr. Paradis "in an effort to establish that the

Subject Pistol is defective and unreasonably dangerous. However, Paradis is not qualified by

education, training or experience to render any such opinions. Further even if he was qualified,

he simply fails to identify an actual defect in the Subject Pistol and his overall opinions are

unreliable." (Doc. No. 56 at 2.) In other words, Defendant has challenged Mr. Paradis's expert

opinions under the reliability prong of this Court's gatekeeping function, arguing that Mr.

Paradis's opinions are not reliable because: (1) Mr. Paradis is not qualified "by knowledge, skill,

experience, training, or education," and (2) the opinions are not "based upon sufficient facts or

data," and they are not "the product of reliable principles and methods." Fed. R. Evid. 702. The

Court will address each challenge in turn.

### 1.   Knowledge, skill, experience, training, education

Defendant argues that Mr. Paradis is not an expert in the design or manufacture of firearms and is therefore not qualified to offer opinions about the "design characteristics of firearms[.]" (Doc. No. 56 at 11.) Defendant elaborates as follows:

> Paradis admits that he does not consider himself a firearms design expert or a firearms manufacturing expert. He has never been involved in the design of a firearm; he has never been employed by a manufacturer of firearms; prior to this case he had never been hired as a consultant to a firearm manufacturer; he has not completed coursework or received a certificate related to gunsmithing; he has no experience in firearm design; he holds no patents; and he has never designed a firearm or firearm component part.

(*Id.* at 11-12 (internal cites to the record omitted).) Defendant analogizes this case to, *Hauck v. Michelin N. Am., Inc.*, 343 F. Supp. 2d 976, 982 (D. Colo. 2004). There, "plaintiff's purported expert sought to testify regarding an alleged defect in defendant's tire," but during deposition admitted he was "not an expert in tire design or manufacture." (Doc. No. 56 at 10-11 (internal quotations omitted).) The court stated, "to be qualified in one area of discipline or science does not necessarily demonstrate that the tendered expert is qualified in other areas of the discipline." (*Id.*) Relying on *Hauck*, Defendant argues that Mr. Paradis "could potentially qualify as an expert to discuss the retail sales of firearms and training persons to safely handle firearms. But …. [h]e certainly is not qualified to provide opinion testimony to a jury in this case with respect to the design characteristics of firearms, the testing of firearms by manufacturers to meet industry and governmental standards, the manufacturing process for firearms, or other aspects of firearm production." (*Id.* at 11.)

Plaintiff responds that, "Mr. Paradis' testimony … shows the angle at which the PM 45 discharged, the distance that Plaintiff was shot from, the place where the PM 45 likely made impact, and the likely location where the gun dropped[,]" and that Mr. Paradis' expertise allows

him to form the opinion "that it is improbable and unlikely that Plaintiff was able to shoot himself in the bathroom stall by mishandling the firearm or pulling the trigger, but instead, the weapon is defective and that it discharged upon strike [sic] the bathroom floor when it fell out of the holster." (Doc. No. 67 at 10-11.) In other words, Plaintiff does not dispute that Mr. Paradis cannot identify the actual defect in the subject firearm. Instead, Plaintiff contends that the information in Mr. Paradis's report "relates to how the discharge occurred and the likelihood of a deadly defect in the gun's design." (Doc. No. 67 at 12.)

As a threshold matter, the Court observes that there appears to be a disconnect as to the scope of Mr. Paradis's testimony. Defendant argues that Mr. Paradis is offering "opinions regarding the design or manufacture of the Subject Pistol[.]" (Doc. Not. 56 at 2.) Plaintiff on the other hand, argues that Mr. Paradis's opinion concerns the circumstances of the discharge, focusing on the angle and distance Plaintiff was shot from, the place of impact, and the likely location of the drop. (Doc. No. 67 at 10-11.) According to Plaintiff, Mr. Paradis's "expert opinion measures the likelihood of different scenarios and paints a clearer picture of what happened during the incident." (*Id.* at 12.) The Court has reviewed Mr. Paradis's reports carefully and assessed the scope of his opinions. Based on those reports, it appears Mr. Paradis will <u>not</u> opine on a particular defect. In other words, Plaintiff will not seek to qualify Mr. Paradis as a design or manufacturing expert, but rather an expert on the handling of firearms and the circumstances surrounding the discharge.[1] The Court will now analyze Mr. Paradis's experience, training, and qualifications accordingly.

---

[1] The Court notes that in at least one portion of his Daubert Response, Plaintiff's argument could be construed to mean that Mr. Paradis will opine that the firearm is actually defective. (Doc. No. 67 at 12 (stating that Mr. Paradis opines, "it is improbable and unlikely that Plaintiff was able to

"Mr. Paradis was an active-duty soldier in the United States Army Infantry from 1975-1979 and a member of the Colorado National Guard from 1980-1988 where he served as both a small arms instructor and a gun chief. He spent many years in the military handling weapons, learning how to disassemble and reassemble them and he is trained on a variety of firearms." (Doc. No. 67 at 2; Doc. No. 67-1 [Paradis CV].) He also "owned and operated a firearms and gunsmithing business since 1983," and "is a certified firearms instructor." (Doc. No. 67 at 2; Doc. No. 67-1.) He "has testified in excess of fifty times on firearms and ammunition cases throughout the State of Colorado and in the Federal District Court of Colorado, and has provided his expertise as an expert consultant to law enforcement, the Colorado Springs Metro Crime Lab, the Department of the Air Force Office of Special Investigations Detachment, and the Department of the Army Military Police Battalion." (Doc. No. 67 at 3; Doc. No. 67-1.) For approximately fifteen years, "Mr. Paradis was employed as a crime scene investigator and criminologist with the El Paso County, Colorado Public Defender's Office, specializing in gunshot cases, crime scene reconstruction, blood spatter analysis and forensic investigations[.]" (Doc. No. 67 at 3; Doc. No. 67-1.) He has also "authored and co-authored numerous published articles and texts on accidental shootings, gun design, human factors in fatal shootings, human

---

shoot himself … but instead, *that the weapon is defective* and that it discharged … when it fell out of the holster.").) However, based on Mr. Paradis's unequivocal testimony that he cannot identify the defect, (Doc. No. 61-3 [Paradis Depo.] at 124:20-25), and based on the overall content of Mr. Paradis's reports, the Court construes counsel's statements to mean that Mr. Paradis will testify about the facts and circumstances *from which a jury could infer* that it is more probable than not that the firearm was defective, but not that Mr. Paradis will testify that there is indeed a defect or that he knows what the defect is. To the extent Mr. Paradis strays from the confines of his reports and attempts to testify that he knows of a specific defect in the firearm, that testimony will not be permitted at trial.

factors issues in the design and operation of firearms, and human factors issues in handgun safety and forensics." (Doc. No. 67 at 3; Doc. No. 67-1.) Additionally, Mr. Paradis "has received specialized training, education and experience in all aspects of crime scene and shooting incident reconstruction, forensic investigation, bloodstain pattern analysis, firearms and toolmark examination, accidental and unintentional discharges, proper trajectory measurement, wound ballistics, gunshot residue (GSR) muzzle effluent, GSR analysis, gunpowder pattern analysis, microscopic analysis, fiber and textile analysis, gunshot distance determinations, and numerous other topics." (Doc. No. 67 at 3-4; Doc. No. 67-1.)

The Court finds that Mr. Paradis can offer valuable opinions about the circumstances surrounding this shooting incident, the handling of the firearm, and whether the firearm was discharged in close proximity to Plaintiff's body or from a distance. However, Mr. Paradis is not an expert in the design or manufacture of firearms. Indeed, he admits that much. (Doc. 56-6 [Paradis Depo.] at 96: 5-10 (testifying that he does not consider himself a "firearms design expert," or a "firearms manufacturing expert.").)

### 2.     Facts, data, and reliable principles

Defendant argues that the "Paradis' opinions are solely based on assumptions and unsupported speculation," and that they "are not the product of reliable scientific or otherwise accepted principles and methods." (Doc. No. 56 at 12.) Specifically, Defendant argues that Mr. Paradis has a "discharge theory" (namely, that the gun likely discharged when it hit the ground) but no testing results to support his theory, because when Mr. Paradis conducted drop testing and impact tests on an exemplar firearm, "he was never able to get it to discharge." (*Id.* at 13.) Defendant also argues that "[a]lthough there is a clear analytical gap between the data and his

conclusions…Paradis chooses to ignore the scientific method in its entirety and seeks to proffer his unsupported opinion that the Subject Pistol drop fired when his only valid basis in science is directly inapposite to his conclusions." (*Id.*) Relatedly, Defendant argues that "Paradis 'cherry-picks' other purported evidence, such as reports of recalls from other firearms manufacturers and a news article related to another claimed incident involving a Kahr firearm, and somehow concludes Plaintiff's story is justifiable." (Doc. No. 56 at 15 (internal citations omitted).) This, Defendant argues, "is the definition of a speculative, unreliable, *ipse dixit* opinion that the U.S. Supreme Court has determined should not be presented to a jury." (*Id.*)

Plaintiff responds that Mr. Paradis: 1) "inspected Plaintiff's clothing…utilizing high powered microscopic analysis," 2) "conducted an inspection of Plaintiff's medical reports," 3) "conducted test firing of an exemplar Kahr PM 45 with identical ammunition, and 3) "conducted a reconstruction of the shooting in this incident using the trajectory of the bullet from the point of entry into Plaintiff's body and the current location of the bullet behind Plaintiff's lower-left rib cage[.]" (Doc. No. 67 at 5-6.)The Court has reviewed Mr. Paradis's reports, resume, and deposition testimony excerpts, and agrees with Plaintiff that Mr. Paradis's opinions are reliable because they are based on the application of his training and experience to the evidence in this case and to the reconstruction work and opinions offered by Defendant's experts. Specifically, Mr. Paradis has multiple certifications concerning firearms handling, extensive experience as a firearms instructor, and he was a criminalist for the State of Colorado for over fifteen years. (Doc. No. 67-1.) Mr. Paradis has completed workshops and training for crime scene reconstruction and shooting incident reconstruction, and his resume reflects meaningful continuing education for forensic professionals, including in bloodstain pattern analysis. (*Id.*) It

is clear from Mr. Paradis's reports that he brought all of his professional training, education, and experience to bear when he analyzed the forensic evidence and formed opinions about, for example, the trajectory of the bullet, the blood stains on Plaintiff's clothes, the gun residue or lack thereof, and more. This is not a case of "cherry-picking" evidence. Mr. Paradis acknowledges that he was not able to cause the exemplar firearm to discharge, but notes that he was not able to drop test the actual firearm, and that although rare, it is possible that even firearms that meet all safety standards can on occasion discharge when dropped. Against that backdrop, Mr. Paradis opines that in *this* case, the blood stains, medical records, relevant distances in the bathroom stall, the floor tile, and lack of residue and stippling, indicate the gun was discharged from the floor and not in closer proximity to Plaintiff's body.

In short, the opinions Mr. Paradis seeks to offer may not be based on drop testing—and a jury may take issue with that—but his opinions are based on facts, data, testing, and reliable principles and methods. The Court finds Defendant's arguments go to the weight the jury may give to the testimony, but not to admissibility.

**B.      Defendant's Summary Judgment Motion**

Described at a high level, Defendant's summary judgment arguments are that: 1) Plaintiff cannot carry his burden of proving a defect or causation, and 2) Plaintiff's claims must be dismissed because the Protection of Lawful Commerce in Arms Act ("PLCAA") precludes claims against manufacturers of firearms for damages "resulting from the criminal or unlawful misuse of a qualified product by the person or a third party…." 15 U.S.C. § 7903(5)(A). (*See generally* Doc. No. 61.) The Court will address each argument in turn.

**1.      Proof of defect and causation**

This argument is based—almost entirely—on the same arguments Defendant made in connection with its Daubert Motion. First, Defendant incorporates its arguments from the Daubert Motion, arguing that if Plaintiff's expert is excluded, the jury cannot "address the risk-benefits of adopting certain designs, safety features and other critical aspects of a firearm." (Doc. No. 61 at 8-9.) Next, Defendant argues that even if Mr. Paradis is not excluded, Defendant is entitled to a Colo. Rev. Stat. § 13-21-403(1)(b) presumption[2] that the firearm is non-defective, and Plaintiff has failed to rebut that presumption because he "has not presented any evidence establishing a defect in the design or manufacture of the Subject Pistol." (Doc. 61 at 11-12.) Defendant argues that Mr. Paradis's "admission alone that he could not locate or identify a defect in the Subject Pistol warrants summary judgment." (Doc. No. 61 at 13.) And finally, Defendant argues that if Mr. Paradis cannot identify a defect, it follows he cannot opine that the defect caused Plaintiff's injuries. (*Id.* ("Plaintiff's proposed expert could not identify a defect let alone

---

[2] Although not relevant to the Court's determination on the SJ Motion, the Court looks ahead to trial and notes that the Colorado Supreme Court has—in the context of overturning a jury instruction based on this presumption—stated the following:

> It is precisely because the plaintiff (the party against whom the presumption is directed) already has the burden of going forward with evidence in this case that an instruction based on the statutory presumption of section 13–21–403(3) is meaningless. If a plaintiff fails to present sufficient evidence that a product is defective, he cannot satisfy the burden of persuasion or establish a prima facie case and a court will direct a verdict for the defendant. On the other hand, a plaintiff who has presented sufficient evidence to defeat a motion for a directed verdict has necessarily rebutted the presumption of section 13–21–403(3). Therefore, no reason exists for a trial judge to instruct a jury on the statutory presumption of section 13–21–403(3).

*Mile Hi Concrete, Inc. v. Matz*, 842 P.2d 198, 205–06 (Colo. 1992) (citing *Sexton v. Bell Helmets, Inc.*, 926 F.2d 331 (4th Cir.1991)).

determine if it caused Plaintiff's injuries.").) Said another way, Defendant is arguing that

Plaintiff needs an expert, and even assuming Plaintiff's expert is permitted to testify, Plaintiff

cannot prove defect and causation.

Defendant's argument that Plaintiff's claims fail without expert testimony is moot

because the Court has already decided it will allow Mr. Paradis to testify. However, the Court

will consider whether "[t]he evidence clearly demonstrates that there was no defect in the

Subject Pistol." (Doc. No. 61 at 13.)

Plaintiff argues that both Mr. Paradis's report and Plaintiff's testimony "allege that the

gun discharge was due to it simply dropping with enough force. A gun that can discharge by

simply dropping should be considered defective and unreasonably dangerous, but that is a

question for the jury." (Doc. No. 66 at 11 (citing *Johnson v. Colt Indus. Operating Corp.*, 797

F.2d 1530, 1534-35 (10th Cir. 1986).) Plaintiff also points to "doctor's reports…and physical

evidence supporting the fact that the gun was discharged after dropping on the floor[,]" and notes

that "[t]he weight given to that evidence is something for the jury to consider." (Doc. No. 66 at

12.) The Court will not recite each of Mr. Paradis's observations, but it has reviewed Mr.

Paradis's reports and Plaintiff's purported evidence and finds there is evidence from which a jury

might conclude that the gun was discharged at a distance rather than in close proximity to

Plaintiff's body. For example, the jury might believe that the angle of the wound, the crack on

the floor, the absence of residue and stippling, all indicate that the gun was discharged from a

distance. From that, a jury might infer that the firearm discharged upon impact, and from that a

jury might infer that the firearm was defective. Thus, Plaintiff's evidence—even if not direct

proof of a defect—is sufficient to survive summary judgment. *See generally Union Ins. Co. v.*

*RCA Corp.*, 724 P.2d 80, 83 (Colo. App. 1986) (holding that despite plaintiff's inability to obtain direct proof of a defect, "plaintiff's evidence was sufficient as a matter of law to create an issue of fact as to the element of defect."), overruled on grounds unrelated to this proposition by *Mile Hi Concrete, Inc. v. Matz*, 842 P.2d 198, 206 n. 17 (Colo. 1992); § 54:9, *Circumstantial Evidence*, Am. L. Prod. Liab. 3d § 54:9 ("In general, the elements of a products liability case may be proven by circumstantial as well as direct evidence, and circumstantial evidence may establish the entire basis for recovery under negligence, strict products liability, or breach of warranty."); *see also Olivero v. Trek Bicycle Corporation*, 291 F. Supp. 3d 1209, 1221-1224 (D. Colo. 2017) (rejecting the notion that a plaintiff seeking to prove a manufacturing defect must always retain an expert to perform special testing on the product itself, and finding that circumstantial evidence, even if "less-than-ideal," could allow a jury to conclude there was a manufacturing defect).

The Court also notes that in this case circumstantial evidence may be the only way a jury could conclude that this particular firearm was defective because Defendant did not permit drop testing of the subject firearm. *See generally Oja v. Howmedica, Inc*., 111 F.3d 782, 793 (10th Cir. 1997) (where direct proof of a manufacturing defect was impossible because the product at issue was missing, and plaintiff had to rely on circumstantial evidence exclusively, the court held, "[u]nder such circumstances, we hold that a jury could reasonably conclude that [plaintiff's] PCA hip suffered from a manufacturing defect."). The Court cannot allow Defendant to shield the subject firearm from drop testing (which could theoretically generate direct evidence of a manufacturing defect), then use the lack of direct evidence as a sword against Plaintiff's claims. Certainly the jury can discount Plaintiff's circumstantial evidence, disbelieve

Plaintiff's witnesses, or find that Plaintiff's evidence is outweighed by Defendant's evidence, but those are not reasons for this Court to grant summary judgment.

That said, the Court does not see a genuine dispute over the existence of a *design* defect. The multiple drop tests conducted by experts on exemplar firearms, coupled with Mr. Paradis's admission that he could not re-create the discharge on exemplar firearms, or identify a specific defect, leave little doubt that at trial Plaintiff will not be able to offer credible evidence of a *design* defect. The only circumstantial evidence Plaintiff may be able to point to is Mr. Paradis's knowledge of other shooting incidents, but that alone is insufficient to carry his burden on a design defect claim. Certainly Mr. Paradis can testify about other discharge incidents and how they inform his theory of what occurred here, and certainly he can use that information to support a *manufacturing* defect theory that is supported by other evidence, but given the overwhelming evidence against a *design* defect, and given Mr. Paradis's admission that he failed to find a design defect, no reasonable jury could conclude that the firearm was defectively designed. Therefore, the Court finds that Defendant is entitled to summary judgment on Plaintiff's claims, only to the extent they are based on *design* defect.

## 2.    PLCAA

Next, Defendant argues that the PLCAA requires dismissal. Subject to some exceptions, the PLCAA requires dismissal of any civil action that is:

> brought by any person against a manufacturer or seller of a qualified product or a trade association, for damages, punitive damages, injunctive or declaratory relief, or penalties or other relief ***resulting from the criminal or unlawful misuse of a qualified product by the person*** or a third party. . . .

15 U.S.C. §§ 7902, 7903(5)(A) (emphasis added). One exception to this general bar against suit, is when an action is based on "physical injuries … resulting directly from a defect in design or

manufacture of the product," so long as the firearm was "used as intended or in a reasonably foreseeable manner[.]" 15 U.S.C. § 7903(5)(A)(v). However, this products liability exception will not apply if, "the discharge of the product was caused by a volitional act that constituted a criminal offense," because that act will "be considered the sole proximate cause of any resulting … personal injuries[.]" *Id.*

In support of its PLCAA argument, Defendant cites the following cases:

<u>*Adames v. Sheahan*, 909 N.E.2d 742 (Ill. 2009)</u>

In *Adames*, a thirteen-year-old boy named Billy Swan was playing with his father's semi-automatic Beretta pistol when he accidentally shot and killed his friend, Josh Adames. 909 N.E.2d at 745. Plaintiffs sued the pistol manufacturer, among others, "alleging design defect, failure to warn, and breach of the implied warranty of merchantability." *Id.* at 759. "The PLCAA was enacted on October 26, 2005, two months after the trial court entered summary judgment in favor of defendants, and applied retroactively," therefore the Illinois Supreme Court carefully reviewed the statute for applicability and made a few findings relevant to this case. *Id.* at 759–60 First, the court held that the PLCAA, "does not contain a requirement that there be criminal intent or a criminal conviction." *Id.* at 761. Billy's juvenile adjudication and the lack of criminal intent notwithstanding, the court found that "Billy's misuse of the Beretta … had the character of a crime and was "in the nature of a crime" and, therefore, was a criminal misuse," in the context of the PLCAA. *Id.* The court also found "that Billy's act was a volitional act[,]" because "even if Billy did not intend to shoot Josh, Billy did choose and determine to point the Beretta at Josh and did choose and determine to pull the trigger. Although Billy did not intend the consequences of his act, his act nonetheless was a volitional act." *Id.* at

763. The court also rejected plaintiffs' constitutional arguments and ultimately found that the

PLCAA required dismissal of the only remaining products liability claim, a failure to warn

claim. *Id.* at 765.

*Ryan v. Hughes-Ortiz*, 959 N.E.2d 1000 (Ma. Ct. App. 2012)

In *Ryan*, while Charles Milot was released on probation, Thomas Hughes allegedly

helped him by lending money, providing jobs around his house, and generally helping him back

on his feet. 959 N.E.2d at 1002. At some point during the arrangement, Mr. Milot took firearms

from Mr. Hughes's home. One day, Mr. Hughes picked up Mr. Milot and took him to Mr.

Hughes's home where Mr. Milot was supposed to repair some items. Mr. Hughes left, and when

he returned two hours later, he found Mr. Milot's dead body covered in blood. Upon

investigation, the police found that Mr. Milot "was attempting to put the gun back in the

container when the round was fired, striking the victim in the upper left leg....The victim

apparently walked out of the bedroom, down the front stairs, into the living room, used the

telephone and walked to the front door where he collapsed and died." *Id.* "The plaintiff brought

claims of breach of the implied warranty of merchantability, negligence, wrongful death, and

unfair and deceptive acts and practices against Glock" in connection with Mr. Milot's death. *Id.*

at 1006. The plaintiff's defect theory was that "the Glock pistol and gun case 'were defective

because the [gun] case caused the loaded Glock ... pistol ... to discharge through the case and

because the pistol was likely to discharge unintendedly' and that 'Glock so negligently and

carelessly designed the Glock Model pistol and storage case ... that the pistol discharged into the

Decedent's body mortally wounding the Decedent.'" *Id.* at 1006-07.

On appeal from the trial court's grant of summary judgment under the PLCAA, plaintiffs made two arguments relevant here. First, plaintiffs argued there was no evidence that the gun was "misused" either criminally or unlawfully. Second, they argued the discharge of the firearm was an accident, not "caused by a volitional act that constituted a criminal offense," and therefore the act could not cut off the causation element of the product defect theory. *Id.* at 1008. The court disagreed with plaintiffs, acknowledging there were no criminal charges brought against Mr. Milot in connection with the incident, but noting that Mr. Milot possessed the firearm after having been convicted of a felony. *Id.* The court held that was sufficient to meet the "criminal or unlawful misuse" element of the PLCAA. *Id.* The court also found that "the relevant volitional act that caused the gun's discharge was Milot's unlawful possession of the Glock pistol. Milot's volitional act constituted a criminal offense and the design defect exception is therefore not applicable." *Id.* at 1008-09. In other words, given Mr. Milot's prior conviction, the possession of the pistol alone, satisfied both the criminal misuse requirement (sufficient to bring the matter within the ambit of the PLCAA), and the volitional act requirement (sufficient to cut off causation and preclude the products liability exception to the PLCAA).

*Travieso v. Glock, Inc*., 526 F. Supp.3d 533 (D. Ariz. 2021)

In *Travieso*, a 14-year old girl somehow came into possession of a Glock handgun, which she had on her person while travelling home from a youth camping trip. 526 F. Supp.3d at 536. Carlos Daniel Travieso was in the same vehicle with the girl when the gun discharged and hit Mr. Travieso in his back, causing spinal injuries and rendering him a paraplegic. *Id.* Criminal charges were never brought against the girl. *Id.* Plaintiff brought a products liability claim against the firearm manufacturer. The *Travieso* court conducted an extensive analysis of the

PLCAA to determine whether it barred the claim. Specifically, the court considered whether the civil action resulted from "the criminal or unlawful misuse" of the firearm, such that the PLCAA applied. *Id.* at 546. The Court held that even though the young girl was not criminally charged, her actions "violated multiple criminal statutes including the federal law against possession of a handgun by a juvenile," and the PLCAA's immunity was "triggered by the criminal nature of the act, not whether the actor is or can be charged with the crime." *Id.* at 546-47. Next, the court considered whether there was a "volitional act" that precluded application of the products liability exception. The Court found there was, because even if the shooting was not intentional, the girl "took other volition[al] acts that were criminal offenses, such as intentionally taking possession of the gun and pulling the trigger while in the vehicle with the gun pointed at another person." *Id.* at 548. For the *Travieso* court, "volitional" appeared to be interchangeable with "reckless." *Id.* It held that because "the shooing [was] caused by criminal possession and recklessness of a third party[,]" the PLCAA's products liability exception did not apply and the PLCAA precluded plaintiff's claim. *Id.*

Although each of these PLCAA cases is helpful and informative, the Court notes that it is not bound by any of these decisions. Still, like other courts considering whether a claim is precluded by the PLCAA, the Court will conduct its analysis in two steps. First, it will consider whether the claim is a qualified civil liability action, "resulting from the criminal or unlawful misuse" of the pistol, thereby requiring application of the PLCAA. 15 U.S.C. § 7903(5)(A), Second, the Court will consider whether the products liability exception saves Plaintiff's claim from dismissal, recognizing that the exception cannot apply if "the discharge of the product was caused by a volitional act that constituted a criminal offense." 15 U.S.C. § 7903(5)(A)(v).

**a.      Is this claim the result of "criminal or unlawful misuse"?**

As noted above, several courts have held that the phrase "criminal or unlawful misuse" does not necessarily require a criminal conviction or even a criminal charge. The Court agrees. Had Congress intended to limit the application of the PLCAA only to instances where a person was charged or convicted of a crime, it could have said as much. Here, Defendant argues that "Plaintiff disregarded the ban on firearms in the Movie Theater, was likely carrying this pistol in a concealed fashion without a permit, and illegally discharged the weapon." (Doc. No. 61 at 17). The Court will analyze each act to determine whether any act constitutes "criminal or unlawful misuse" for purposes of the PLCAA.

***Movie theatre ban on firearms***

Defendant does not argue that carrying a weapon in a private facility prohibiting weapons, is criminal. Therefore, the Court assumes that Defendant references the violation of the movie theatre's policies as "unlawful misuse." The PLCAA expressly sets forth conduct that will be considered "unlawful misuse," defining it as any "conduct that violates a statute, ordinance, or regulation as it relates to the use of a qualified product." 15 U.S.C. § 7903(9). Defendant has not cited any statute, ordinance, or regulation that was violated simply because Plaintiff possessed the firearm in the movie theatre. Under the doctrine of *expressio unius est exclusio alterius*, the Court presumes Congress intended the list of violations to be exhaustive and will not read into it other types of misconduct. *See generally Fish v. Kobach*, 840 F.3d 710, 745 (10th Cir. 2016) (finding that "the fact that Congress spoke only to requiring information on the motor voter form tends to cut against rather than in favor of Secretary Kobach's approach. The omission of requirements for, or prohibitions on, other documents that states might require does not suggest

that states may require anything that they desire to facilitate the registration process beyond the

form itself. To the contrary, it suggests by the negative-implication canon,

*expressio unius est exclusio alterius*, that Congress intended that the motor voter form would—at

least presumptively—constitute the beginning and the end of the registration process.").

Moreover, misconduct at a private establishment is not automatically "unlawful." Therefore, the

act of carrying a weapon into a private facility prohibiting weapons, will not—on its own—

trigger the PLCAA.

### Concealed carry

Next, the Court considers whether the manner in which Plaintiff carried the pistol will

satisfy the "criminal or unlawful misuse" requirement. Although Defendant does not cite a

particular statue, regulation, or ordinance in connection with this argument, it notes that the

weapon may have been concealed. (Doc. 61 at 17.) If it was, Plaintiff may have been in violation

of Colorado state law. *See* Colo. Rev. Stat. § 18-12-105. However, by Defendant's own

admission, this fact is not undisputed. (*Id.* ("Plaintiff … was *likely* carrying this pistol in a

concealed fashion without a [.]") (emphasis added).) Moreover, and even if it was undisputed

that Plaintiff was carrying a concealed weapon in violation of state law, the causation element

also turns on unresolved questions of fact. *See* 15 U.S.C. §§ 7902, 7903(5)(A) (requiring

dismissal if a claim is "***resulting from*** the criminal or unlawful misuse of a qualified product…"

(emphasis added).).

### Illegal discharge

Turning next to Defendant's argument that Plaintiff's illegal discharge of the weapon is

"criminal or unlawful misuse" that requires PLCAA immunity, the Court agrees. Plaintiff notes

that he "entered a plea of nolo contendere and received a deferred judgment and sentence which

ultimately resulted in dismissal of the charges whereupon the subject pistol was returned to

[Plaintiff] by law enforcement." (Doc. No. 66 at 6.) However, whether Plaintiff entered a plea of

guilty or nolo contendere, is irrelevant. The facts and circumstances of the incident gave rise to

the criminal charge, and the conduct was therefore criminal in nature. (*Id.*) Indeed, under the

statute that criminalizes discharge in a building, a person can be guilty of this offense based on a

knowing or reckless discharge. *See* Colo. Rev. Stat. 18-12-107.5 ("Any person who knowingly

or recklessly discharges a firearm into any dwelling or any other building or occupied structure,

or into any motor vehicle occupied by any person, commits the offense of illegal discharge of a

firearm."). Moreover, the PLCAA's language is broad, and its application is not limited based on

a person's conviction or plea. It is not for this Court to place constraints on Congress's broad

language. Because the firearm's discharge in a public building was criminal in nature, and

because that discharge resulted in this claim, the Court concludes the PLCAA applies.

> **b.    Was the discharge caused by a volitional act that constituted a criminal offense?**

According to Defendant, the products liability exception does not save Plaintiff's claim

because the discharge was caused by a "volitional act that constituted a criminal offense." 15

U.S.C. § 7903(5)(A)(v). However, the Court finds this determination turns on facts that are still

in dispute. This case is not like *Ryan*, which Defendant argues is most analogous. (Doc. No. 70 at

10.) In *Ryan*, the shooter shot himself presumably as Plaintiff did here, by accident. 959 N.E.2d

at 1008. However, in that case, the plaintiff was a convicted felon in possession of a weapon and

the Court found it was that volitional act (the unlawful possession) that constituted a criminal

offense which ultimately caused the accident. *Id.* at 1008-09. Here, Plaintiff's possession alone was not a criminal offense.

This case is also not like the other cases Defendant cites—*Adames*, and *Travieso*. In those cases, the shooters were minors who also possessed the weapons illegally (even if they were never charged or convicted). In this case, and as noted above, the only criminal or unlawful act is the illegal discharge. However, while "unlawful misuse" resulting in a civil action is sufficient to require *application* of the PLCAA, a different finding is required under the products liability exception. *See generally Chavez v. Glock, Inc.*, 207 Cal. App. 4th 1283, 1317-18 (Cal. Ct. App. 2012) (finding that "[u]nlike the definition of 'a qualified civil liability action,' which broadly includes any civil action 'resulting from the criminal or unlawful misuse' of a firearm, Congress much more narrowly defined the exclusion from excepted product defect suits to apply only if 'the discharge of the product was caused by a volitional act that constituted a criminal offense'…. Indeed, to construe the exclusion as expansively as do [defendants], would effectively eliminate the exception for product design defect claims expressly provided by Congress."). Here, Plaintiff's alleged illegal discharge is not enough to preclude application of the products liability exception as a matter of law because a jury would still need to determine whether the illegal discharge (or some other criminal offense) was volitional. Additionally, Defendant faces a heightened causation requirement under the products liability exception. Application of the PLCAA only requires that the claim result from criminal or unlawful misuse, however, the products liability exception hinges on whether or not the volitional criminal offense caused the actual "discharge of the product[.]" 15 U.S.C. § 7903(5)(A)(v).

## CONCLUSION

For the foregoing reasons, **IT IS ORDERED THAT**:

(1) Saeilo, Inc. D/B/A Kahr Arms I/S/H/A Kahr Firearms Group's Motion to Preclude Plaintiff's Proposed Expert Paul Paradis (Doc. No. 56) is **DENIED**.

(2) Defendant's Motion for Summary Judgment with Statement of Material Facts and Memorandum in Support (Doc. No. 61) is **GRANTED TO THE EXTENT ANY PORTION OF PLAINTIFF'S CLAIM(S) IS GROUNDED IN DESIGN DEFECT THEORIES, AND DENIED IN ALL OTHER RESPECTS.**

Dated this 22nd day of December, 2022

**BY THE COURT:**

Maritza Dominguez Braswell
United States Magistrate Judge